NORTHCUTT, Judge.
D.G. was adjudicated delinquent for two counts of sexual battery and committed to a high-risk sex offender program. He complains that the juvenile court departed from the recommendation by the Department of Juvenile Justice (DJJ) without adequate reasons. We affirm the delinquency adjudication, but we reverse the commitment and remand for further proceedings.
After hearing testimony at an adjudicatory hearing, the juvenile court found that D.G. committed two sexual batteries as alleged. At the subsequent disposition hearing, DJJ recommended that adjudication be withheld and that D.G. be placed on two years’ probation with several conditions, including sex offender evaluation and treatment. The prosecutor urged the court to reject that recommendátion and instead to adjudicate D.G. and commit him to a high-risk sex offender program. The court ruled that withholding adjudication and imposing probation were inappropriate in D.G.’s case. Instead, the court adjudicated and committed D.G. as the State requested.
Noting that D.G. qualified for a sex offender designation, the juvenile court announced and then reduced to writing four reasons for its decision:
1. Based on nature of the charges— forcible anal and oral rape of a younger, smaller acquaintance.
2. Total continuous chaos at home— domestic battery, etc.
3. Mom not even able to recite his caregivers names.
4. Noted conflict already w/ “George” at Baycare.
All of those factors had been referenced in the Department’s predisposition report (PDR). The report recited graphic details of the offenses and the victim’s age; described D.G.’s home situation, including past domestic violence between the parents and also involving D.G.; observed that D.G.’s mother did not know who had diagnosed her son’s mental health conditions; and reported that D.G. had “issues with George at Baycare.”
Significantly, the PDR also noted that “[a] comprehensive evaluation was requested by the Department on 12/12/12[;] however, the Department has not yet received it.” It further stated that at a multidisciplinary commitment staffing on 12/18/12, “the case was discussed at length and it was determined that ... a recommendation could not be made without the comprehensive evaluation.” However, at the January 17, 2013, disposition hearing, DJJ gave a bare recommendation for probation while making no reference to a comprehensive evaluation of D.G. Moreover, the record on appeal does not contain an evaluation or an amended PDR summarizing an evaluation.
On appeal, D.G. argues that the court was required to justify its departure from DJJ’s recommendation for probation and that it failed to state any reasons other than what was already contained in the PDR. Although we agree that D.G.’s commitment must be reversed, the issue is more procedurally complex than presented by the parties. As we will explain, the problem with the court’s commitment order was not that it disregarded the probation recommendation but, rather, that it prescribed a restrictiveness level without first obtaining a recommendation from the Department.
Section 985.433, Florida Statutes (2011), *3 governs the disposition hearing[1] when a court has found that a juvenile offender committed a delinquent act; section 985.441 governs commitment. The disposition statute requires a two-step process. In the first step, the court must decide whether to adjudicate and commit the child to the custody of DJJ or instead to withhold adjudication and place the child on probation. § 985.433(6) (“The first determination to be made by the court is a determination of the suitability or nonsuit-ability for adjudication and commitment of the child to the department.”). DJJ provides a recommendation that the court must consider, and the statute provides criteria to guide DJJ’s recommendation. § 985.433(6)(a)-(h). But “[i]t is the intent of the Legislature that the criteria set forth in this subsection are general guidelines to be followed at the discretion of the court and not mandatory requirements of procedure.” § 985.433(6). A court’s determination that the child should be adjudicated and committed must be expressed, orally or in writing, and “shall include a specific finding of the reasons for the decision to adjudicate and to commit the child to the department.” § 985.433(7).
In this case, DJJ recommended that adjudication be withheld and that D.G. be placed on probation. Other than specifying a few conditions of the probation, the Department offered no insight into D.G.’s rehabilitative needs, the treatment or services available to meet those needs, or the risk he posed to the community. As mentioned, the PDR reported that no recommendation regarding those issues could be made without a comprehensive evaluation. The record contains no evidence that the evaluation was conducted or, if it was, the results. On the other hand, the court expressly articulated the reasons for its view that adjudication and commitment were more appropriate than probation in this case. To this point, we find no error.
Having properly decided that D.G. should be adjudicated and committed, the court was obliged in the second step of the disposition process to determine the appropriate restrictiveness level of the commitment. See § 985.03(45)(a)-(e) (defining five restrictiveness levels: minimum-risk nonresidential, low-risk residential, moderate-risk residential, high-risk residential, and maximum-risk residential). In this step, DJJ is required by subsection 985.433(7)(a) to recommend to the court a placement and treatment plan and specifically identify “the restrictiveness level most appropriate for the child.” Under subsection (b), the court must commit the child at the level recommended by the Department unless it provides reasons, supported by a preponderance of the evidence, for disregarding the recommendation. § 985.433(7)(b).
The Florida Supreme Court’s decision in E.A.R. v. State, 4 So.3d 614 (Fla.2009), involved this second step and, specifically, the type of reasons that would warrant a court’s disregard of DJJ’s recommended commitment level. In E.A.R., the supreme court held that a juvenile court must contrast the characteristics of the restrictiveness level recommended by the Department to that chosen by the court and that it must explain how the child’s rehabilitative needs and the public’s safety would be better served by the court’s choice. 4 So.3d at 638. Further, when departing from the DJJ recommendation, the juvenile court may not simply repeat information known to the Department but then announce a different re *4 strictiveness level; rather, the court “must provide a legally sufficient foundation for ‘disregarding[1] the DJJ’s professional assessment and PDR by identifying significant information that the DJJ has overlooked, failed to sufficiently consider, or misconstrued with regard to the child’s programmatic, rehabilitative needs along with the risks that the unrehabilitated child poses to the public.” Id.
It was in this phase of the disposition process that the juvenile court went awry in D.G.’s case; it imposed a high-risk restrictiveness level without first obtaining the DJJ’s recommendation. The First District’s opinion in J.B.S. v. State, 90 So.3d 961, 962 (Fla. 1st DCA 2012), a case involving circumstances similar to this one, is instructive. A juvenile offender was adjudicated for several charges, including lewd and lascivious molestation of a victim less than twelve years old. DJJ had initially recommended probation, but the prosecutor and the court disagreed. Id. at 962-63. When the court determined that the child should be committed, it asked the Department to recommend a restrictiveness level treatment facility, over the defense objection that the court had not articulated reasons to depart from the probation recommendation. Id. at 963. DJJ held a multidisciplinary conference and then recommended a moderate-risk program. Id. at 964. After an evidentia-ry hearing, the pourt rejected the child’s request for probation and committed him to a moderate-risk facility.
The First District affirmed, explaining that E.A.R. did not apply to the first step in the disposition process, in which the court must decide whether to adjudicate and commit, but to the second step, involving the determination of the juvenile’s treatment plan and the restrictiveness level of his or her commitment. Id. at 967. Further, the First District held that in that case the juvenile court did not actually depart from DJJ’s recommendation because the court had obtained a new report once it decided to commit the child rather than place him on probation as initially recommended. Id. at 968.
The First District followed this reasoning in a subsequent case, not involving a juvenile sex offender. In B.K.A. v. State, 122 So.3d 928, 930 (Fla. 1st DCA 2013), as happened here, the juvenile court rejected DJJ’s initial recommendation for probation. The First District affirmed that aspect of the case, noting that “[probation is not a restrictiveness level.” Id. at 930. Compare § 985.03(43) (defining probation) with § 985.03(45) (defining restrictiveness levels). But the B.K.A. court reversed the commitment order because the juvenile court did not first obtain a DJJ recommendation for the appropriate level of commitment.
We reverse D.G.’s commitment order for the same reason. In doing so, we reject the State’s assertion that juvenile sex offenders are not governed by the same statutory scheme that requires deference to DJJ’s recommendation regarding the restrictiveness level for which a juvenile offender is to be committed.[2] Dis *5 regarding a provision about misdemeanors, the commitment statute provides the court with four options. One option has since been repealed, as noted.
(1) The court that has jurisdiction of an adjudicated delinquent child may, by an order stating the facts upon which a determination of a sanction and rehabilitative program was made at the disposition hearing:
(a) Commit the child to a licensed child-caring agency willing to receive the child....
(b) Commit the child to the department at a restrictiveness level defined in s. 985.03....
(c) Commit the child to the department for placement in a program or facility for serious or habitual juvenile offenders in accordance with s. 985.47 [repealed by chapter 2011-70, § 4, Laws of Florida].
[[Image here]]
(d) Commit the child to the department for placement in a program or facility for juvenile sexual offenders in accordance with s. 985.48, subject to specific appropriation for such a program or facility.
§ 985.441(1).
The State asserts that these are discrete options and that the juvenile court’s election to place D.G. in a juvenile sexual offender program exempted it from the required deference to DJJ’s recommendation regarding the appropriate restrictiveness level of a commitment under section 985.438(7). We are not inclined to agree, if for no other reason than the absence of statutory language suggesting that the options set forth in section 985.441(1) are mutually exclusive. Indeed, to treat them as such would be inconsistent with the comprehensive approach to juvenile justice prescribed in chapter 985.
In E.A.R., 4 So.3d at 628-29, the supreme court rejected an interpretation of the juvenile delinquency law that “focused exclusively upon one statutory provision ... without addressing any related provisions that further reveal the Legislature’s intent and address the broader standards that should control juvenile dispositions.” By arguing that E.A.R. does not apply to juvenile sex offenders, the State misses the import of the supreme court’s decision. First, the supreme court held that all of the juvenile justice statutes in chapter 985 must be construed in pari materia “to harmonize the statutes and to give effect to the Legislature’s intent.” 4 So.3d at 629 (citation and internal quotation mark omitted).
Part VII' of this chapter (sections 985.43-985.494) addresses the disposition process. However, chapter 985 also contains a comprehensive and extensive array of provisions that address legislative intent, statutory definitions, and the respective duties of the DJJ and the circuit court from juvenile intake through disposition. Therefore, a disposition hearing is actually the culmination of a more extensive process, which the Legislature constructed to provide adjudicated juvenile offenders “the most appropriate dispositional services in the least restrictive available setting” while also protecting the public from further acts of delinquency. § 985.03(21), Fla. Stat. (2007); see also § 985.01-.02, Fla. Stat. (2007).
4 So.3d at 628 (footnotes omitted). Second, the supreme court held that chapter 985 is remedial in nature and expressly provides “the intent of the Legislature that this chapter be liberally interpreted and construed in conformity with its declared purposes.” Id. at 629 (emphasis omitted) (quoting ch. 90-208, § 1, at 1087, Laws of Fla., now found at § 985.01(2)).
*6 The supreme court traced the development of Florida’s juvenile justice system, and this history shows the importance of maintaining a comprehensive approach.
During the 1970s and 1980s, our juvenile justice system was in shambles and under siege with legal actions filed by juveniles and their representatives in state and federal court that sought to improve the conditions in Florida’s former system of “state training schools.” [Florida Bar,] Florida Juvenile Law and Practice, ... § 1.14 [ (10th ed. 2007) ]. To combat these poor conditions, the State entered into a consent decree in one federal action and, thereby, agreed to reduce the juvenile population in the training schools and to establish “a system of programs and services to meet the individual needs of juvenile offenders, including a continuum of care, a multidisciplinary assessment process, and a classification system based on risk factors.” Id.; see also Fla. H.R. Comm, on Children & Youth, HB 3681 (1990) Staff Analysis 3 (final May 16, 1990) (on file with Fla. State Archives ....) at 4 ... (“[The Act] integrates the requirements of the [federal] Consent Decree by requiring a multidisciplinary assessment, risk classification, and placement process. The process begins with the risk assessment instrument (RAI) at detention, includes the preliminary sereen-ing and comprehensive assessment ..., and results in the predisposition report (PDR). This report will recommend the child’s priority needs, classification as it relates to risk to the community, and an appropriate treatment plan and placement.”).
The 1990 Act was consistent with the goal of “develop[ing] a community-oriented juvenile justice system which treats juveniles in the least restrictive manner while ensuring the safety of the community.” HB 3681 Final Staff Analysis at 10 (emphasis supplied).
4 So.3d at 629-30 (alterations in original except alterations to first internal citation).
Thus, we cannot discard the entire statutory framework in the case of children who have committed sexual offenses. Rather than focusing on isolated provisions, we interpret the statutes in accordance with the legislative intent “for the DJJ and the juvenile courts to work in concert to provide juvenile offenders with dispositions that adequately and individually address their particular needs and risk levels” so that the juvenile court may perform its “overarching duty to determine the most appropriate dispositional services in the least restrictive available setting.” E.A.R., 4 So.3d at 631-32 (footnote, citation, and internal quotation marks omitted).
Wholly aside from the foregoing, we note that the State’s assertion that the dispositions described in section 985.441(1) are mutually exclusive was not made to the juvenile court, and the court did not treat them as such. Contrary to the State’s argument here, the juvenile court both committed D.G. to a juvenile sexual offender program and committed him to a high-risk restrictiveness level. In the absence of the DJJ recommendation mandated by section 985.433(7)(a), the latter was error.
Adjudication affirmed; commitment reversed; remanded for further proceedings in accordance with this opinion.
WALLACE and SLEET, JJ., Concur.

. " ‘Disposition hearing' means a hearing in which the court determines the most appropriate dispositional services in the least restrictive available setting provided for under part VII, in delinquency cases.” § 985.03(21).

. In dicta, the First District noted that it was "not certain that section 985.433(7)(b) applies to proceedings under section 985.475” regarding juvenile sexual offenders. J.B.S., 90 So.3d at 967. The reason for the court’s uncertainty turned on the fact that, in the version of section 985.441(1) at issue there, the provision addressing serious or habitual ,, juvenile offenders expressly required a commitment determination under section 985.433, whereas the provision addressing juvenile sexual offenders did not. Id. at 967 n. 1. But that dichotomy has since been eliminated by a statutory amendment that removed the serious or habitual juvenile offender provisions from section 985.441. See ch.2012-56, § 4, at 705, Laws, of Fla.